UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LAURA HUTCHINSON, | ) | Case No.: 1:15-cv-01047 - JLT |
| Plaintiff, | )<br>)<br>) | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |
| v. | ) | |
| BEAR VALLEY COMMUNITY SERVICES DISTRICT and DAVID EDMONDS, | )<br>)<br>) | (Doc. 23) |
| Defendants. | ) | |

      Defendants Bear Valley Community Services District and David Edmonds seek the dismissal of several causes of action alleged by Plaintiff Laura Hutchinson pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 23) Specially, Defendants seek dismissal of Plaintiff's claims for violations of her First Amendment rights and failure to provide a hearing regarding her disability. (*Id.*) Plaintiff opposes the dismissal, arguing the factual allegations are sufficient to support her claims. (Doc. 26) For the reasons set forth below, Defendants' motion to dismiss is **GRANTED in PART** and **DENIED in PART**.

**I.     Allegations of the Second Amended Complaint**

      Plaintiff alleges she began working as a police officer for the Bear Valley Police Department, which is operated by the Bear Valley Community Services District, in August 2007. (Doc. 22 at 2, ¶¶ 4, 8) Plaintiff took pregnancy leave in 2008. (*Id.* at 3, ¶ 9) When Plaintiff returned from leave, she was not required to undergo field training. (*Id.*)

According to Plaintiff, she began experiencing "discrimination on the job as well as retaliation," which resulted in her "filing a lawsuit under FEHA in March 2012." (Doc. 22 at 2, ¶ 8) Plaintiff reports the lawsuit settled in October 2012. (*Id.* at 3, ¶ 9).

Plaintiff alleges that she "was taken off work by her physician due to a high risk pregnancy" in January 2013. (Doc. 22 at 3, ¶ 10)  In April 2013, "Plaintiff filed a charge with the DFEH complaining about discrimination and retaliation that are made unlawful by FEHA." (*Id.*)

In September 2013, Plaintiff returned to work. (Doc. 22 at 3, ¶ 12)  Plaintiff alleges that upon her return, she "was forced to undergo remedial training (again) after her return from maternity leave." (*Id.*)  Plaintiff asserts she "was the most senior patrol officer, but was then told the department no longer recognized seniority." (*Id.*)

According to Plaintiff, she was "the only female patrol officer," and the fact that the department did not recognize her seniority "adversely affected [her] by disallowing her to bid for more favorable shifts, which affected her ability to obtain reasonable child care." (Doc. 22 at 3, ¶ 12)  She reports that Police Chief Walthers "told Plaintiff that her children do not qualify for 'hardships' which prevented Plaintiff from qualifying for a more favorable day shift." (*Id.*) In addition, Plaintiff contends the failure to recognize her seniority adversely affected her training opportunities, vacation requests, and new patrol car assignments. (*Id.*)  Plaintiff alleges the "coveted positions were given to male officers and Plaintiff was refused the right to even test for such positions." (*Id.*)

Plaintiff asserts that in September 2013, she "had a discussion with Senior [O]fficer Richey about not being able to apply for promotions (detective and senior position) and she felt this was due to gender discrimination." (Doc. 22 at 4, ¶ 13)  Plaintiff reports she then "filled out and submitted an application for an intermediate post certificate, which would provide a pay increase." (*Id.,* ¶ 14) However, the application, which included her college transcripts, "was never sent in by Chief Walthers, which is a perfunctory step for Walthers to perform." (*Id.*)  Plaintiff alleges Officer Richey told her that "Chief Walthers 'did not agree' with her transcripts." (*Id.*)  According to Plaintiff, "[a]t least one male officer (Pierce) received an advance post without question by Chief Walthers." (*Id.*)

Plaintiff alleges that in October 2013, she "passed remedial training and began patrolling on her own." (Doc. 22 at 4, ¶ 15)  However, "BVCSD altered shift schedules so that Plaintiff's shift involved

no 'double coverage' or backup for her," though all other officers had backup. (*Id.*) In addition, Plaintiff reports her shift was at night, rather than the day as she was previously scheduled. (*Id.*) She maintains that if "BVCSD recognized [her] seniority, she would have been given a more favorable daytime shift with backup." (*Id.*)

She alleges that in November 2013, she again had a discussion regarding gender discrimination with Officer Richey and the assistant manager for the district, Sandy Janzen. (Doc. 22 at 4, ¶ 13) Plaintiff alleges that "Janzen told [her] not to complaint about the district," and reported her complaints to Walthers. (*Id.*)

According to Plaintiff, in November 2013, she "was called into the office of defendant." (Doc. 22 at 4, ¶ 16) Sandy Janzen informed that Plaintiff she "had been recommended for termination and [instructed her to] not to ask for her annual evaluation." (*Id.*) Plaintiff alleges Janzen told her "it would not be a good evaluation because the chief (Walthers) did not want to give Plaintiff an evaluation at all, notwithstanding the positive daily evaluations she received in relation to her remedial training." (*Id.* at 4-5, ¶ 16)

"In December 2013, Plaintiff was told by third parties that a detective's wife had told them that Chief Walthers and senior officer Richey and detective Damon Pierce were going to 'get rid of Plaintiff' through psychological testing." (Doc. 22 at 5, ¶ 17) Plaintiff reports she "sent an email to Chief Walthers to let him know that she would be looking at other departments," and began to look for another position. (*Id.*) She asserts that after sending the email to Chief Walthers, she learned "the detective's wife had threatened to beat Plaintiff." (*Id.*) Plaintiff alleges she then "filed a written complaint with the district for gender discrimination, retaliation, hostile work environment, and violation of her police officer Bill of Rights." (*Id.*)

Plaintiff alleges that in January 2014, she "was supposed to get Personal Time Off (PTO time) and it was withheld." (Doc. 22 at 5, ¶ 18)

In April 2014, "Plaintiff suffered an injury to her back (on the job) and reported this to her supervisor." (Doc. 22 at 5, ¶ 19) She reports the "injury involved herniated disks in her back, which causes back pain, back spasms, numbness in Plaintiff's foot, compression on Plaintiff's nerve that causes sciatic pain, and weakness in her right leg." (*Id.*) According to Plaintiff, her injury "affected

Plaintiff's walking and ability to perform her job and also take care of her children." (*Id.*)  She alleges that this constituted a disability under the ADA and FEHA. (*Id.*)

Plaintiff alleges that in May 2014, she "was put on duty at the guard station next to the gate to the community without her firearm and out of uniform." (Doc. 22 at 6, ¶ 20)  Before Plaintiff was assigned to this duty, the position had only been held by civilian employees and that placement into this position precluded her from any "advancement opportunities within the police department and in fact was outside the police department where she worked." (*Id.*)

She reports that on May 29, 2014, she "was served with a notice of investigation regarding alleged performance issues and allegedly falsifying documents." (Doc. 22 at 6, ¶ 22)  In addition, she reports that she received a second notice of investigation in June 2014, which indicated "tenants who were renting property owned by Plaintiff … [reported that she] had used her position to intimidate the tenants." (*Id.*, ¶ 23)

Plaintiff alleges she went to the house her tenants had been renting in June 2014, when she "discovered the water had been shut off, and there was approximately $200 of water bills owing for the property." (Doc. 22 at 6, ¶ 24)  Plaintiff asserts she "assumed the tenants had established their own water account, but then learned that the bills were still in her name, and someone had changed the address on the account." (*Id.* at 6-7, ¶ 24)  Plaintiff reports she "learned it was possible the tenants had called the district and pretended to be her to have the billing address changed." (*Id.* at 7, ¶ 24)  She "contacted the Kern County Sheriff's Department about the incident and lodged a complaint that the tenants had potentially used her identity which would constitute identity theft and would be illegal conduct in having the water billing address changed." (*Id.*, ¶ 25)  Plaintiff alleges that after the Sheriff's Department contacted the tenants, the tenants "filed another complaint with defendant BVCSD." (*Id.*, ¶ 26)

Plaintiff asserts that in June 2014, her therapist "took her off work" for severe work-related stress and anxiety. (Doc. 22 at 8, ¶ 29)  She alleges the "stress prevented [her] from conducting her work duties as well as her ability to take care of her children." (*Id.*)  On August 28, 2014, Plaintiff was told "an investigation was being conducted into allegations by her former tenants." (*Id.* at 7, ¶ 28)

She alleges that in August, September, and October, her therapist notified the District that

4

Plaintiff was to remain off work "until further notice." (Doc. 22 at 8, ¶ 29) In addition, Plaintiff reports that during the summer, she had an MRI of her back "which showed significant damage," and a "physician indicated Plaintiff should remain off work until 11/26/14." (*Id.*, ¶ 30) Plaintiff's physician later extended the time she "should remain off work until 1/20/15." (*Id.*) Defendants were notified of her doctor's orders placing her on medical leave. (*Id.*)

According to Plaintiff, in September 2014, she "submitted paperwork to the California PERS system, requesting that she be allowed to receive a disability retirement under applicable law, including Cal. Govt Code 21151." (Doc. 22 at 8, ¶ 31)

In October 2014, she "was served with a Notice Of Proposed Termination by defendant Edmonds, where Edmonds was recommending that Plaintiff's employment with BVCSD be terminated." (Doc. 22 at 9, ¶ 33) The Notice indicated her termination was based, in part, upon the complaints related to her tenants. (*Id.*) Plaintiff reports that Edmonds "requested to meet with Plaintiff, however, Plaintiff was told by her therapist not to have any contact with the district as it was causing great stress." (*Id.*, ¶ 34) Plaintiff alleges she submitted the notes from her therapist, but "the district violated those medical restrictions and demanded that Plaintiff meet with Edmonds." (*Id.*) She asserts that she "was required to respond to the alleged issues … [and] prepared a written rebuttal and submitted it to the district." (*Id.*, ¶ 35)

Plaintiff reports that in January 2015, she was supposed to receive Personal Time Off, which was not given. (Doc. 22 at 9, ¶ 36) The same month, "Plaintiff received notice that union coverage had been changed and that coverage was terminated and she no longer had a union lawyer or representative." (*Id.*, ¶ 37) She asserts this change "would have been pursuant to a union vote and Plaintiff was excluded from any such vote." (*Id.*) On January 29, 2015, "Plaintiff received notice of her termination from BVCSD from defendant Edmonds." (*Id.*, ¶ 38)

On July 8, 2015, Plaintiff initiated this action by filing a complaint against Bear Valley Community Services District and David Edmonds. (Doc. 1) Plaintiff alleges she "was never told whether she qualified or did not qualify for disability retirement until on or about the last week of September 2015 or the first week of October 2015." (Doc. 22 at 9, ¶ 39) At that time, she was told by "an agent of California PERS that she did not qualify for disability retirement because she had been

terminated for cause by BVCSD. There were no appeal rights or written notification given to Plaintiff." *Id*.

Based upon the foregoing facts, Plaintiff identifies seven claims for relief in her Second Amended Complaint: (1) a violation of her First Amendment rights by Edmonds; (2) violation of her First Amendment rights by the District; (3) retaliation in violation of FEHA by the District; (4) retaliation in violation of Title VII by the District; (5) gender discrimination in violation of FEHA by the District; (6) gender discrimination in violation of Title VII by the District; and (7) failure to conduct a hearing in violation of her Fourteenth Amendment due process rights, Cal. Gov't Code § 21156, and California's Administrative Procedures Act. (*See generally* Doc. 22 at 10-18)

Defendants filed the motion now pending before the Court on February 5, 2016, seeking dismissal of the first, second, and seventh claims for relief. (Doc. 23) Plaintiff filed her opposition on February 24, 2016 (Doc. 26), to which Defendants filed a reply on March 2, 2016 (Doc. 17).

## II.     Legal Standards for a Motion to Dismiss

A Rule 12(b)(6) motion "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal under Rule 12(b)(6) is appropriate when "the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). Thus, under Rule 12(b)(6), "review is limited to the complaint alone." *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court explained,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (internal citations, quotation marks omitted). Further, allegations of a complaint must be accepted as true when the Court considers a motion to dismiss. *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S. 738, 740 (1976).

A court must construe the pleading in the light most favorable to the plaintiff, and resolve all doubts in favor of the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). "The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to officer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). However, the Court "will dismiss any claim that, even when construed in the light most favorable to plaintiff, fails to plead sufficiently all required elements of a cause of action." *Student Loan Marketing Assoc. v. Hanes*, 181 F.R.D. 629, 634 (S.D. Cal. 1998). Leave to amend should not be granted if "it is clear that the complaint could not be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

### III.   Section 1983 Claims

Section 1983 "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994). In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered, and show causal relationship between the defendant's conduct and the injury suffered. *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976). A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

### IV.   Discussion and Analysis

#### A.   First and Second Causes of Action

Plaintiff asserts Defendants Edmonds and the District violated her rights by unlawfully retaliating against her for engaging in conduct protected by the First Amendment. (Doc. 7 at 9-11)

7

"The First Amendment forbids government officials from retaliating against individuals for speaking out." *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). The Supreme Court explained: "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006) (citations omitted). The Ninth Circuit set forth the five-step inquiry to determine whether a public employee's First Amendment rights were violated:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

*Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

At trial, a plaintiff bears the burden of showing the speech addressed a matter of public concern, and that her "constitutionally protected speech was a motivating factor in [the] adverse employment action." *Eng*, 552 F.3d at 1070 (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Marable v. Nitchman*, 511 F.3d 924, 930, 932-33 (9th Cir. 2007)). If a plaintiff meets this burden, the burden shifts to the government address the remaining factors, and the government must show "adequate justification" for its actions or, in the alternative, that it "would have reached the same adverse employment decision even in the absence of the employee's protected conduct." *Eng*, 552 F.3d at 1071-72 (citation omitted).

### 1. Claim against Edmonds

Defendants argue that Plaintiff's claim against Edmonds "fails as a matter of law." (Doc. 23 at 15) According to Defendants, the facts alleged are insufficient for Plaintiff "to establish that the Protected Speech constituted a matter of public concern." (*Id.* at 13) Defendants contend that "because the purported Protected Speech does not involve a matter of public concern, it is not subject to First Amendment protection." (*Id.* at 15)

Whether an employee's expression may be characterized as a matter of public concern "must be determined by the content, form and context of a given statement, as revealed by the whole record." *Rankin v. McPherson*, 483 U.S. 378, 384-85 (1987) (citation omitted). In general, speech concerning

"individual disputes and grievances and that would be of no relevance to the public's evaluation of the performance of government agencies, is generally not of public concern." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 924 (9th Cir. 2004) (citation omitted).  On the other hand, "[s]peech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1071 (quoting *Johnson v. Multnomah Cnty., Oregon*, 48 F.3d 420, 422 (9th Cir. 1995) (internal quotations omitted))).  Although this definition is broad, "there are limits." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009).  The Ninth Circuit explained: "In a close case, when the subject matter of a statement is only marginally related to issues of public concern, the fact that it was made because of a grudge or other private interest or to co-workers rather than to the press may lead the court to conclude that the statement does not substantially involve a matter of public concern." *Id.* (quoting *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995)).

In the Second Amended Compliant, Plaintiff alleged she "contacted the Kern County Sheriff's Department about the incident and lodged a complaint that the tenants had potentially used her identity which would constitute identity theft and would be illegal conduct in having the water billing address changed." (Doc. 22 at 7, ¶ 25)  Opposing the motion to dismiss, Plaintiff argues "the issue of criminal activity by Plaintiff's tenants is a matter of public concern as it involved the tenants not only harming Plaintiff, but also engaging in criminal conduct involving a governmental agency (water district)." (Doc. 26 at 2)  Plaintiff asserts, "How a public agency (water district) performs is quintessentially a matter of public concern," and "[t]he fact that Plaintiff's water district was likewise the victim of criminal conduct should end this issue as defrauding or criminally victimizing a public agency cannot rationally be claimed to not involve a matter of public concern."  (*Id.*, citing *Eng*, 552 F.3d at 1073)

Significantly, however, Plaintiff does not allege in the Second Amended Complaint that her police report included allegations of fraud against the water district or stated in any way the agency was a victim of criminal conduct.  Rather, Plaintiff alleges only that she lodged a complaint that her "tenants had potentially used her identity" and illegally changed the address of the water bill. (*See* Doc. 22 at 7, ¶ 25)  Notably, she does not allege that the water provider was, indeed, a public agency, rather than any number of private water companies. Thus, because the complaint establishes only that Plaintiff

9

had a dispute with her tenants,[1] it was not a "matter of political, social, or other concern to the community." *See Eng*, 552 F.3d at 1071; *compare Doe v. County of San Mateo*, 2009 U.S. Dist. LEXIS 26084 at *17-18 (N.D. Cal. Mar. 19, 2009) (the filing of "a police report to complain about police misconduct" is a matter of public concern, and is constitutionally protected speech) *with Reynolds v. Stovall*, 2012 U.S. Dist. LEXIS 49963 at *28 (W.D. Ark. Apr. 10, 2012) (the filing of a police report was not a matter of public concern where it "occurred away from work, and the matter involved a personal, private relationship").

Because Plaintiff identified only a private matter in her police report—the potential theft of her identity—she fails to identify that her complaint raised with the law enforcement agency an issue that would be relevant to "the public's evaluation of the performance of government agencies." *See Alpha Energy Savers,* 381 F.3d at 924. Accordingly, Defendants' motion to dismiss the first cause of action is **GRANTED**.

### 2. Liability of the District

Municipalities or other governmental bodies may be sued as a "person" under Section 1983 for the deprivation of federal rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, a local government unit may not be held responsible for the acts of its employees under a respondeat superior theory of liability. *Monell*, 436 U.S. at 691. Rather, a local government entity may only be held liable if it inflicts the injury of which a plaintiff complains. *Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002). Thus, a government entity may be sued under Section 1983 when governmental policy or custom is the cause of a deprivation of federal rights. *Id.* at 694. The Ninth Circuit explained:

> A plaintiff may . . . establish municipal liability by demonstrating that (1) the constitutional tort was the result of a "longstanding practice or custom which constitutes

---

[1] There are no facts to support that the water agency was the subject of fraud or, rather, the tenants or Plaintiff remain liable for the debt. While counsel argued that the ability change the address on a water bill is a failure of the water company's security about which the public would be interested, there are no facts alleged to suggest that Plaintiff mentioned this to the sheriff's deputy when she made her complaint. The fact that she now thinks that other water company customers would like to know about this, is only peripherally related to what she *actually said* which was, to report what may have been identity theft.

On the other hand, it is, just as easily, a cautionary tale directed to landlords that they take responsibility for closing their water accounts on rental properties or, at a minimum, keep track of whether the landlord received a closing statement from the water company which would indicate the tenant, indeed, established his/her own account.

the standard operating procedure of the local government entity;" (2) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (3) an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate."

*Price v. Sery,* 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002)).

A public entity is also liable for a constitutional violation if the action is taken by a person with final policymaking authority. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) "Whether an official has final policymaking authority is a question for the court to decide based on state law. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) ("[W]hether a particular official has 'final policymaking authority' is a question of *state law*. As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local government unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury.") (emphasis in original) (citations and internal quotation marks omitted)."

In addition, the public entity may be liable if it ratifies the unconstitutional conduct by a non-policymaker. *Christie*, at 1235. Whether ratification has occurred is a question for the jury. *Id*. "To show ratification, a plaintiff must prove that the "authorized policymakers approve a subordinate's decision and the basis for it." *Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915; see *Gillette*, 979 F.2d at 1348 (refusing to find ratification, because "[t]here is no evidence that the City manager made a deliberate choice to endorse the Fire Chief's decision and the basis for it"). Accordingly, ratification requires, among other things, knowledge of the alleged constitutional violation. *See Garrison v. Burke*, 165 F.3d 565, 572 n. 6 (7th Cir.1999) (holding that the municipality was not liable under § 1983, because it had no knowledge of the alleged constitutional violations); *Gattis v. Brice*, 136 F.3d 724, 727 (11th Cir.1998) (stating a similar proposition)." *Christie*, at 1239

Here, Plaintiff alleges that "Edmonds had final policymaking authority from the BVCSD in relation to discipline of employees." (Doc. 22 at 11, ¶ 49)  According to Plaintiff, the District "violated Plaintiff's rights by (1) disciplining Plaintiff with the Notice of Proposed Termination in October 2014 and (2) terminating Plaintiff's job with BVCSD." (*Id.*, ¶ 50) Plaintiff alleges also that

"[b]y reason of Edmonds' policymaking authority, and/or the ratification of his misconduct," the District is liable "for the Edmonds 1983 Speech Violation." (*Id.*, ¶ 51)  However, as discussed above, Plaintiff fails to allege facts supporting a conclusion that she made a statement entitled to the protections of the First Amendment—whether Edmonds was vested with final decision-making authority to terminate Plaintiff or the Board approved the decision.  Accordingly, Plaintiff's claim against the District lacks factual support, and Defendants' motion to dismiss the second cause of action is **GRANTED with leave to amend**[2].

### B.  Seventh Cause of Action: Due Process, Cal. Gov't Code § 21156, and APA

The Fourteenth Amendment guarantees procedural due process to those at risk of suffering an improper deprivation of life, liberty, or property by the government. *Carey v. Piphus*, 435 U.S. 247, 259, 262. In a procedural due process claims, courts first determine whether a liberty or property interest exists (*Hewitt v. Grabicki*, 794 F.2d 1373, 1380 (9th Cir.1986) and, if so, what process is due. *Id*.  To state a cognizable claim for a due process violation under the Fourteenth Amendment, a plaintiff must allege three elements: (1) a property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) a lack of required process. *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).  Constitutional interests are created by "existing rules or understandings that stem from an independent source such as state law - rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

Plaintiff asserts Defendants violated her due process rights because her "right to disability retirement under California law is a vested contractual right that cannot be withheld without due process of law, including, at a minimum, the conducting of a hearing to determine disability." (Doc. 22 at 16, ¶ 72)  Plaintiff alleges:

> Defendants have deprived Plaintiff of her due process rights under the United States Constitution and the Fourteenth Amendment thereto by failing to conduct a hearing in relation to Plaintiff's disability status. In addition, Defendants have violated state law

---

[2] The Court strongly urges Plaintiff to review the statement she made to the law enforcement officer about the water agency, if any, and to determine objectively whether a First Amendment claim may be stated.  Toward this end, the Court reminds Plaintiff of her obligations under Rule 11.

(Govt.Code 21156 and the Cal. Administrative Procedures Act) by failing to conduct such a hearing, including a hearing before an Administrative Law judge.

(*Id.* at 17, ¶ 74)  Further, Plaintiff maintains that Edmonds "was required by law… to file for disability retirement on behalf of Plaintiff once she became disabled in April 2014 (when Plaintiff was placed at the gate, out of uniform, and without her firearm), and failed to perform this duty, and then waited until after Plaintiff was terminated and claiming to PERS that Plaintiff was terminated for cause, when Plaintiff's termination occurred months after Plaintiff applied to PERS for disability retirement." (*Id.* at 18, ¶ 79)

Plaintiff alleges also that Defendants had a continuing obligation to seek disability retirement given the fact that in August 2014, her doctors placed her on medical leave due to stress and her on-the-job back injury.  (Doc. 22 at 8-9, ¶¶ 29-32.  Plaintiff alleges that BVCSD was vested with the authority for determining her eligibility for disability retirement.  Id. at 9, ¶ 32.

Defendants argue Plaintiff is unable to state a claim because, to state a claim for a due process violation, "a plaintiff must demonstrate deprivation of a constitutionally protected right without due process law."  (Doc. 23 at 5-6, citing *Zineron v. Burch,* 494 U.S. 113, 125 (1990))  According to Defendants, "Plaintiff cannot state a procedural due process claim because she cannot establish a 'legitimate claim of entitlement' to disability retirement benefits based on: (i) the fact that she was terminated for cause; and, (ii) the fact that Plaintiff has not sufficiently alleged she was incapacitated for the performance of duty."  (Doc. 23 at 6)

Under California law, an employer who believes an employee is disabled must apply for disability retirement on behalf of that employee, unless the employee waives this right or applies instead for service retirement. Cal. Gov. Code §§ 21153, 21156; *Lazan v. Cty. of Riverside*, 140 Cal.App.4th 453, 464 (2006) This duty is designed to prevent an employer from separating an employee for a medical disability when he/she is eligible for disability retirement. *Haywood v. Amer. River Fire Protection Dist*., 67 Cal. App. 4th 1292, 1305 (1998).  Prior to finding an employee is disabled, a government agency must provide notice an opportunity for a hearing, because involuntary disability retirement would result in a loss of income and deprivation of property.  *See Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950).

13

Here, it appears that Plaintiff believes Defendants should have known she was entitled to disability retirement beginning in April 2014, and applied for disability retirement on her behalf at that time. (Doc. 22 at 17-18, ¶ 79) By this time, she claims her "injury involved herniated disks in her back, which causes back pain, back spasms, numbness in Plaintiff's foot, compression on Plaintiff's nerve that causes sciatic pain, and weakness in her right leg," which "affected Plaintiff's walking and ability to perform her job and also take care of her children." (*Id*. at 5, ¶ 19) Plaintiff reported her back injury to her supervisor, and in May 2014, she was "was put on duty at the guard station next to the gate to the community without her firearm and out of uniform." (*Id*. at 5-6, ¶¶ 19-20) Plaintiff claims Defendants should have sought a disability retirement for her pursuant to *Lazan v. County of Riverside*. (Doc. 22 at 17) Plaintiff impliedly argues that denial of a disability retirement is a deprivation of a property interest under the Fourteenth Amendment. Similarly, Plaintiff contends the failure to hold a hearing regarding her disability status was a violation of her Fourteenth Amendment right to due process.

Pursuant to California Government Code § 21151, a "local safety member incapacitated for the performance of duty as the result of an industrial disability shall be retired for disability." In *Ostlund v. Bobb*, 825 F.2d 1371, 1372 (9th Cir. 1987), the plaintiff, a police officer, was involved in two on-the-job shootings and claimed a disabling psychiatric injury resulted. The city notified him it intended to terminate him due to the emotional or mental condition that "might adversely affect [his exercise of the powers of a peace officer." *Id*. The plaintiff filed an application for disability retirement and for workers' compensation benefits. *Id*. The next month, the city fired the plaintiff. *Id*. The plaintiff filed a petition for writ of mandate and the city denied he had a right to a hearing, admitted he was disabled but denied the disability was work-related. *Id*. Thus, the city denied the disability retirement. *Id*. The plaintiff dismissed the writ petition in favor of pursuing his workers compensation case. *Id*.

Due to developments in the workers' compensation case—which determined that it was the plaintiff's personality conflicts with superiors which made him unable to work—the city then notified PERS that the plaintiff was not disabled and was not entitled to disability retirement benefits. *Ostlund*, at 1372. Though the plaintiff filed suit, the matter was dismissed after the court determined the individuals were entitled to qualified immunity and the city was not liable for failing to hold a hearing

14

because the plaintiff never requested one. *Id*.

On appeal, the Ninth Circuit held, "Section 21022[3] clearly gives city police officers a vested right to disability retirement if they suffer a work-related disability." *Ostlund*, at 1373. *Ostlund* relied upon *Watkins v. City of Santa Ana*, 189 Cal.App.3d 393, 396-97 (1987) which held,

> Police officers and other public employees have a vested contractual right to a reasonable disability retirement pension. (*Frank v. Board of Administration* (1976) 56 Cal.App.3d 236, 243, 128 Cal.Rptr. 378.) The right to the pension arises before the happening of the contingency making it payable. (*Quintana v. Board of Administration* (1976) 54 Cal.App.3d 1018, 1023, 127 Cal.Rptr. 11.) Here, Watkins had a fundamental vested right to disability retirement benefits if, in fact, he was disabled. **The city's decision on that threshold question substantially affects that right.**

(Emphasis added). *Ostlund* rejected the argument that the employee was required to request a hearing for due process rights to be implicated. *Ostlund*, at 1373-1374.

Defendants rely on *Haywood v. Am. River Fire Prot. Dist.*, 67 Cal.App.4th 1292, 1307 (1998) for the proposition that until a safety member is determined to be disabled, she has no protected rights to disability retirement. Notably, however, *Haywood* reads, "[W]e conclude that where, as here, an employee is fired for cause and the discharge is neither the ultimate result of a disabling medical condition **nor preemptive of an otherwise valid claim for disability retirement**, the termination of the employment relationship renders the employee ineligible for disability retirement regardless of whether a timely application is filed." *Id*., emphasis added.

In *Smith v. City of Napa*, 120 Cal.App.4th 194, 206 (2004), the court explained *Haywood* as follows:

> The key issue is thus whether his right to a disability retirement matured before plaintiff's separation from service.[Footnote] A vested right matures when there is an unconditional right to immediate payment. (*In re Marriage of Mueller* (1977) 70 Cal.App.3d 66, 71, 137 Cal.Rptr. 129; see *In re Marriage of Brown* (1976) 15 Cal.3d 838, 842, 126 Cal.Rptr. 633, 544 P.2d 561.) In the course of deciding when the limitations period commenced in a mandate action against a pension board, **the Supreme Court noted that a duty to grant the disability pension (i.e., the reciprocal obligation to a right to immediate payment) did not arise at the time of the injury itself but when the pension board determined that the employee was no longer capable of performing his duties.** (*Tyra v. Board of Police etc. Commrs*. (1948) 32 Cal.2d 666, 671–672, 197 P.2d 710 ["the right has not come into existence until the commission has concluded that the condition of disability renders retirement necessary"].)[Footnote] In the present case, a CalPERS determination of eligibility did

---

[3] California Government Code § 21022 is now codified at § 21151.

> not antedate the unsuccessful certification on the ladder truck. His right to a disability retirement was thus immature, and his dismissal for cause defeated it.
>
> **Conceivably, there may be facts under which a court, applying principles of equity, will deem an employee's right to a disability retirement to be matured and thus survive a dismissal for cause. This case does not present facts on which to explore the outer limits of maturity, however.**

Emphasis added.  Thus, there is a presumption that an employee who is fired for cause before CalPERS determines she is disabled, has no vested right to a disability.  However, presumption may be rebutted by showing that the employer took wrongful, preemptive steps to invalidate the disability retirement claim.  Notably, here, unlike in *Smith*, the conduct which is alleged to have given rise to her termination occurred *after* her disability was known to Defendants.  (Doc. 22 at 6) Moreover, there is an inference raised by the pleading that the firing decision was a substitute for the disability determination and was made to prevent her from obtaining the disability retirement benefits.  (Doc. 22 at 17-18 ¶ 79.)  Indeed, in her third through sixth causes of action, Plaintiff claims that Defendants' acts caused her to suffer a "loss of employment benefits."  Thus, the Court cannot determine that Plaintiff did not have a due process right to the disability determination.

On the other hand, though Defendants argue that Plaintiff was entitled to a hearing only after the disability retirement was denied by CalPERS and that her relief can be afforded by CalPERS alone, courts have made clear, "PERS is responsible merely for entering the formal decision granting or denying disability retirement benefits." *Watkins,* 189 Cal.App.3d at p. 396.  Rather, it is the local agency that makes the decision. *Petrillo v. Bay Area Rapid Transit Dist.*, 197 Cal.App.3d 798, 809 (1988).  Thus, assuming a hearing was required—and, at this time the Court must assume the allegations of the petition are true—it was BVCSD's obligation—rather that CalPERS's obligation—to notify Plaintiff of her right to a hearing and to hold it.

Finally, Defendants argue that the fact that Plaintiff's doctors had placed her on repeated terms of temporary leave shows she was not incapacitated.  The Court rejects this argument because this determination by the doctors is not equivalent to the determination required under the disability retirement scheme that she was not incapacitated.  Alternatively, Defendants argue that an officer who retains the ability to perform work—even without a firearm—and is placed on "permanent modified

light duty" does not trigger the obligation to retire the officer for disability. *Stuessel v. City of Glendale*, 141 Cal.App.3d 1047, 1053-54 (1983). "If a person can be employed in [a permanent light duty] assignment, he should not be retired with payment of a disability retirement pension." *Id.* citing *Craver v. City of Los Angeles*, 42 Cal.App.3d 76, 80 (1974) (.)

In *Stuessel*, the court noted that the plaintiff's classification as a safety officer was unaffected by the modified duty assignment and he retained the same right to "salary and fringe benefits and promotional opportunities as other employees in the police officer classification." *Id*. at 1044. Here, Plaintiff contends she was placed in a civilian job that was historically part-time and not within the police department and that the new assignment precluded her from promotions and denied her the nearly $1,000 she would have received otherwise as a uniform allowance. (Doc. 22 at 6, 7)

Thus, the facts alleged are more closely aligned with *Lazan* than *Stuessel*. In *Lazan*, 140 Cal.App.4th at 461-462, the plaintiff was offered a temporary clerical position outside of the law enforcement agency that did not offer her the same promotional opportunities she would have had otherwise. The court concluded the plaintiff would be a "sheriff's deputy" in name only. *Id*. The court observed, "In effect, Lazan has been determined to be disabled and therefore has not been offered an opportunity to return to duty as a sheriff's deputy. But, based on the County's position that she is able to return to her job duties, she has been denied any relief during her incapacity." *Id*. at 462-463. Because Defendant acted as though Plaintiff was disabled—by giving her a job that did not comply with the requirements of *Stuessel*, at this juncture, Plaintiff's pleading is sufficient to state a claim. Accordingly, Defendants' motion to dismiss the seventh cause of action is **DENIED**.

V.     **Leave to amend**

Here, Plaintiff has failed to provide sufficient facts to support her claims under the First Amendment. However, though this is the second motion to dismiss filed as to these claims, the prior motion did not claim that Plaintiff's speech failed to raise an issue of public concern. Moreover, at the hearing, Plaintiff's counsel indicated an ability to amend the complaint to cure any defects.

Thus, the Court must grant one final opportunity to amend the complaint, related only to the First and Second Causes of Action, to cure the deficiencies raised in the motion to dismiss. *See Noll v. Carlson*, 809 F.2d 1446, 1448-49 (9th Cir. 1987); *see also Lopez*, 203 F.3d at 1128 (dismissal of a *pro*

*se* complaint without leave to amend for failure to state a claim is proper only where it is obvious that the plaintiff cannot prevail on the facts alleged, and that an opportunity to amend would be futile).

**V.     Conclusion and Order**

Based upon the foregoing, **IT IS HEREBY ORDERED**:

1.     Defendants' motion to dismiss is **GRANTED** as to the first and second causes of action. The first and second causes of action claims are **DISMISSED** with 21 days leave to amend;

2.     Defendants' motion to dismiss is **DENIED** as to the seventh cause of action.

IT IS SO ORDERED.

Dated:   **March 15, 2016**                    /s/ Jennifer L. Thurston
                                               UNITED STATES MAGISTRATE JUDGE